**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1032-21

NETWORK INFRASTUCTURE
TECHNOLOGIES, INC.,

      Plaintiff-Appellant,

v.

HACKENSACK UNIVERSITY
MEDICAL CENTER, a division of
HMH HOSPITALS CORP., NTT
DATA SERVICES, LLC, [1] ARTHUR
LITTWIN, CHRISTOPHER
COVELLO, JED B. KESSLER,
MICHAEL SCAGLIONE, MIGUEL
FALCON, JOSE SANCHEZ, and
BILLY WALLBURG,

      Defendants-Respondents.

_____

Submitted October 18, 2023 – Decided November 4, 2024

Before Judges Vernoia, Gummer and Walcott-Henderson.

---

[1] NTT Data Services, LLC was improperly pleaded as NTT Data Corp.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000086-20.

Nagel Rice LLP, attorneys for appellant (Jay J. Rice and Bradley L. Rice, of counsel and on the brief).

Greenberg Traurig, LLP, attorneys for respondents Hackensack University Medical Center, Arthur Littwin and Christopher Covello (Wendy Johnson Lario and Clarissa Gomez, of counsel and on the brief).

Anne B. Sekel (Foley & Lardner, LLP), attorney for respondents NTT Data Services, LLC, Jed Kessler, Michael Scaglione, Miguel Falcon, Jose Sanchez and Billy Wallburg (Donald W. Schroeder (Foley & Lardner, LLP), of the Massachusetts bar, admitted pro hac vice, of counsel and on the brief; Anne B. Sekel, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

Plaintiff Network Infrastructure Technologies, Inc., appeals from an order entered on March 3, 2021, denying its motion for partial summary judgment on its various claims against defendant Hackensack University Medical Center (HUMC) based on their contract as alleged in plaintiff's third-amended complaint. Plaintiff also appeals from a February 5, 2021 discovery order, an August 11, 2021 judgment issued after a bench trial, and a November 18, 2021

amended judgment in which the court awarded defendant Arthur Littwin attorneys' fees. For the reasons that follow, we affirm.

## I.

The facts and procedural history are extensive; thus, we summarize only those facts relevant to our determination of the issues before us. It is undisputed plaintiff specializes in providing information technology (IT) services to health-care organizations. HUMC is a private, for-profit hospital and is a division of the Hackensack Meridian Health (HMH) network of hospitals. NTT Data Services, LLC (NTT) is another IT services provider. Defendant Littwin was a "Remedy Developer" for plaintiff since 2014 and was responsible for maintaining and customizing what was titled the Remedy program, a unique IT ticketing system utilized by HUMC. Defendant Christopher Covello and other individually named defendants were employees of plaintiff.

On July 23, 2013, plaintiff and HUMC entered into a Master Services Agreement (MSA), which remained in effect through February 4, 2020. The MSA required plaintiff to provide IT and personnel services to HUMC for an initial term of thirty-nine months following the execution of the agreement. Under the MSA, "Initial Term" is defined as "a period of thirty-nine (39) months" beginning on the "Effective Date" of July 22, 2013.

A-1032-21

In the MSA, plaintiff agreed "that its personnel performing services shall be qualified and trained to, and shall fulfill the requirements set forth in the [statements of work (SOW)] and as reasonably specified by [HUMC] from time to time." Paragraph 9 of the MSA addressed the agreement's term and termination, with Paragraph 9(a) discussing the "Initial Term" and Paragraph 9(c) detailing "Termination."

The MSA also included a non-solicitation provision whereby each party agreed not to offer employment to the other's employees for a period of one year after termination of the MSA. The MSA also included an indemnity clause in Paragraph 3 providing:

> nothing in this [a]greement or otherwise shall require either [p]arty to defend, indemnify[,] or hold harmless the other [p]arty for any loss, claim, damage, expense, fees, settlement, penalty or attorneys' fees that result from the act or omission of the [p]arty seeking such defense, indemnification or hold harmless.

The limitation-of-liability clause in Paragraph 4 stated there was no liability to either party for lost profits and that:

> IN NO EVENT WILL EITHER PARTY'S LIABILITY . . . FOR ANY DAMAGES TO [HUMC] . . . EXCEED THE FEES PAYABLE BY [HUMC] TO [PLAINTIFF] HEREUNDER FOR THOSE SERVICES RENDERED HEREUNDER WITHIN THE THREE (3) MONTHS PRIOR TO [THE] EVENT FROM WHICH SUCH DAMAGES AROSE, . . . REGARDLESS OF THE

4 A-1032-21

FORM OF ACTION (INCLUDING NEGLIGENCE, STRICT LIABILITY OR OTHER ACTIONS IN TORT) . . . .

The MSA referred to SOWs, and it is undisputed that beginning in 2013, the parties agreed to various SOWs, each describing with particularity different services plaintiff would provide to HUMC. There are three SOWs at issue in this appeal: the Help Desk SOW, the Surface Pro/Anesthesia SOW and the Remedy SOW. Each of the SOWs stated, "the parties desire to add this [SOW] to the [MSA]" and "[a]ll terms not otherwise defined in this SOW shall have the meanings ascribed to them in the [MSA]." Each SOW included a separate temporal term, and each provided that its "term shall otherwise be governed by the [MSA]."

The Help Desk SOW

The Help Desk SOW required plaintiff to provide call support for HUMC. It included a call-volume threshold of 125,000 calls per year, at a bi-weekly cost of $36,048. Under the MSA, when the yearly call-volume threshold was reached, plaintiff would invoice HUMC for "overages," defined as calls that exceeded the call-volume threshold. In 2019, the yearly call volume was reached in September. Manira Hossain, plaintiff's Director of Finance, prepared

5

invoices for overage charges after the call-volume threshold was reached, and she began invoicing HUMC for overages.[2]

The Anesthesia SOW

In December 2017, plaintiff and HUMC signed the Anesthesia SOW that required plaintiff to provide a technician to "deploy" 115 Surface Pro laptop computers for use in HUMC's anesthesia department. According to the SOW, the "deployment project" required plaintiff to unbox all the laptops and associated hardware, provide a full inventory list, configure and connect the devices, and train each anesthesiologist in two-hour slots on how to use the equipment. The cost for plaintiff's services under the Anesthesia SOW was $14,900.

The first shipment of Surface Pros was delivered to HUMC on March 13, 2018, and the second shipment, containing the majority of the Surface Pros, was delivered on June 11, 2018. On August 5, 2019, one of plaintiff's employees informed HMH that sixty-one Surface Pros were missing.[3] According to another

---

[2] In September 2019, the charge for overages was $75,057; in October 2019, the charge was $134,813; in November, the charge was $122,092; and in December 2019, the charge was $161,889.

[3] Hackensack Police Department investigated the cause of the missing computer equipment and filed a report on September 24, 2019, but later determined there

A-1032-21

employee, all the work required of plaintiff under the Anesthesia SOW on fifty of the remaining computers had been completed. Those fifty Surface Pros were ready to be deployed, but that employee averred he had been told HUMC was not prepared to receive the computers.

Plaintiff argues that it partially performed under the terms of the contract and is entitled to a portion of the $14,900 otherwise due under the Anesthesia SOW. HUMC asserts there was a breach of the Anesthesia SOW because it never requested a delay in deploying the Surface Pros and that plaintiff is liable for conversion of the missing computers because they were lost while in plaintiff's care.

The Remedy SOW and Termination of Littwin's Employment

In late 2013, plaintiff and HUMC signed the Remedy SOW, which required plaintiff to provide a full-time on-site "Remedy" specialist. To that end, plaintiff hired Littwin in January 2014 to provide Remedy services. He was the sole employee who worked in that capacity through February 21, 2020, and served as a full-time on-site specialist to support HUMC's use of the Remedy

---

was not enough evidence to press charges against anyone. HUMC never filed an insurance claim for the missing Surface Pros. On September 6, 2019, HUMC obtained an estimate for replacing the missing equipment at a cost of $134,000.

A-1032-21

application. Pursuant to the Remedy SOW, plaintiff charged HUMC $75 per hour for Littwin's services.

In November 2019, Littwin's manager was terminated after the Surface Pros went missing. According to Littwin's deposition testimony, he began searching for other employment at that time because he believed he would also be terminated. On January 5, 2020, Littwin applied through the HUMC website for a position with HMH as a reporting analyst. Weeks later, he was offered and accepted employment with HMH.

The Extension Agreement and Settlement of Plaintiff's Claims

Toward the end of 2019, HUMC began discussing alternative IT solutions with another company, defendant NTT. Although HUMC had signed a contract with NTT in October 2019 for NTT to take over the IT solutions responsibilities at HUMC effective January 1, 2020, HUMC also executed an extension agreement with plaintiff on November 18, 2019, for plaintiff to continue to provide IT solution services by extending the MSA and all SOWs "at their current levels and fees in order to maintain the status quo through January 4, 2021." The first clause of the extension agreement expressly notes plaintiff and HUMC "previously entered into a [MSA] . . . which auto-renews by its terms." And, HUMC signed the extension agreement without informing plaintiff that it

8

had already entered into the October 2019 contract with NTT pursuant to which NTT was required on January 1, 2020, to begin to provide HUMC with the IT services that plaintiff was otherwise contractually obligated—pursuant to the extension agreement—to provide.

Plaintiff estimated that HUMC owed nearly $2 million in overage fees under the Help Desk SOW that had accrued prior to January 1, 2019. To resolve the payment issue and disputed claims related to overage fees due under the Help Desk SOW, plaintiff and HUMC executed a settlement agreement and release on December 18, 2019. Pursuant to this agreement, HUMC paid plaintiff $1,070,000.

Unpaid Invoices

In December 2019, HUMC suffered a ransomware attack, resulting in a significant increase in help desk calls. Approximately two months later, HUMC notified plaintiff it would terminate the MSA effective May 31, 2020. After plaintiff learned the MSA would be terminated, Hossain began invoicing HUMC for monthly overages, instead of waiting to invoice HUMC after the yearly call-volume threshold reached 125,000 calls as provided for in the MSA. Hossain pro-rated the 125,000 annual threshold into twelve equal monthly thresholds of

9

about 10,417 calls per month and billed HUMC each month for the calls that exceeded what she had determined was the monthly call-volume threshold.

Hossain sent a list of invoices—without the actual invoices—to HUMC for overage charges for the period from January 2020 through April 2020. HUMC did not pay these charges. More particularly, Hossain sent HUMC an invoice for "overages" for January 2020, where the total number of help desk calls that month was 21,780, and Hossain calculated the overage amount due as $85,876. On December 24, 2020, using plaintiff's QuickBooks records, Hossain created a statement-balance report reflecting the total balance plaintiff claimed was owed by HUMC. However, Hossain did not send that report to HUMC and did not provide the actual invoices.

Littwin's Termination and the Non-Compete Clause

Plaintiff stopped providing Remedy services to HUMC after Littwin, who had been the only individual working for plaintiff as a Remedy specialist at HUMC, resigned his employment with plaintiff. Littwin's acceptance of employment with HMH instantly became an issue with plaintiff because he had previously signed plaintiff's "Acknowledgment of Non-Compete and Confidentiality Policies," which restricted employees from working for "a

 A-1032-21

client, customer or [p]artner" of plaintiff within one year of the termination of their employment with plaintiff.[4]

On February 18, 2020, Littwin notified NIT's president, Lior Blik, that he had accepted employment with HMH beginning February 24, 2020, and that his last day of work for plaintiff would be February 21, 2020.  That same day, the Human Resources Director of Matrix Global Services, LLC—which had acquired plaintiff in 2016—sent Littwin a letter confirming his resignation but stating that he was being terminated immediately for violating the non-compete agreement he had signed at the beginning of his employment in 2014 with plaintiff.  Despite the letter, Littwin continued to work daily through February 21, 2020, as he had indicated in his resignation later, and plaintiff never revoked his credentials during that time.  It is undisputed that in February 2020, when Littwin left, he had been paid for the work he did on February 18, 2020, but had not been paid for the remaining days of February 19, 20, and 21, 2020, he had worked.

---

[4] Plaintiff required that its employees sign an acknowledgment of receipt of its employee manual that included an employment-at-will policy stating employees could be terminated at any time and, in pertinent part, that they could not accept employment with a client of plaintiff within one year following the termination of their employment.

A-1032-21

Approximately three months after Littwin started working for HMH, plaintiff filed suit against HUMC, seeking specific performance of the MSA, the SOWs, and the extension agreement between NIT and HUMC as well as "compensatory damages, punitive damages, costs of suit and reasonable attorney's fees." In the lawsuit, plaintiff asserted various causes of action, including breach of contract, unfair competition and misappropriation of trade secrets, and fraud and intentional misrepresentation. Thereafter, plaintiff amended its complaint to include NTT as well as Littwin and other former employees as defendants, alleging tortious interference against NTT and breach of contract against Littwin and other former employees and seeking enforcement of the non-solicitation clause. Plaintiff later filed a third-amended complaint, adding a new defendant, Christopher Covello, plaintiff's IT asset management administrator.

Plaintiff's third-amended complaint is the operative complaint for purposes of this appeal, and it includes nine counts. The first seven counts are against HUMC and allege: breach of contract pertaining to the non-solicitation clause (count one); specific performance enjoining HUMC from terminating the

contract (count two);[5] misappropriation of trade secrets (count three); breach of the SOWs (count four); non-payment of invoices (count five); breach of the implied covenant of good faith and fair dealing with respect to the MSA and the settlement and extension agreements (count six); fraud and intentional misrepresentation with respect to the extension and settlement agreements (count seven). Count eight, tortious interference with contract, is pleaded against NTT. Count nine, breach of contract, is pleaded against the individual defendants for enforcement of the restrictive covenants, specifically based on the non-solicitation clause in plaintiff's employee manual.

In its amended answer, HUMC counterclaimed for: conversion of the missing Surface Pros (count one); breach of the Anesthesia SOW (count two); breach of the covenant of good faith and fair dealing with respect to the Anesthesia SOW (count three); breach of contract with respect to the MSA and SOWs (count four); and breach of the covenant of good faith and fair dealing as to the MSA and SOWs (count five). Littwin also filed a counterclaim alleging violations of the New Jersey Wage Theft Act, N.J.S.A. 34:11-56A, and Wage Payment Law, N.J.S.A. 34:11-4.1. to -33.6.

---

[5] Count two of the third-amended complaint was dismissed by consent on March 4, 2021.

A-1032-21

Plaintiff moved for partial summary judgment on counts one, four and five—which respectively alleged breach of contract as to the non-solicitation provision of the MSA, breach of the SOWs, and non-payment of invoices—and dismissal of HUMC's counterclaims for conversion (count one), breach of contract (count two), and breach of the covenant of good faith and fair dealing (count three). HUMC, Littwin, and Covello cross-moved for summary judgment on all the counts against them. In the same motion, HUMC also sought summary judgment on counts two and three—for breach of the Anesthesia SOW and breach of the covenant of good faith and fair dealing with respect to the Anesthesia SOW—of its counterclaim.[6] Littwin also moved for summary judgment on the wage claim in his counterclaim. NTT also moved to dismiss count eight—tortious interference with contract—and the individual defendants moved to dismiss count nine—enforcement of a restrictive covenant.

At oral argument on the summary-judgment motions, the court stated, "[b]oth counsel agree[] that the terms of the various agreements were unambiguous, and the [c]ourt should interpret the agreements as written." However, the court recognized the parties had offered different and conflicting

---

[6] Littwin and Covello moved for summary judgment only as to count nine of the third-amended complaint—for breach of contract and enforcement of restrictive covenant.

14

interpretations of what they otherwise asserted were the agreements' unambiguous terms. The court framed the parties' arguments as follows:

> the difficulty is that NIT and HUMC interpret the agreement differently. NIT asserts that, after the [I]nitial term, no early termination of the MSA and related agreements are permitted. Rather, after the [I]nitial term, the only way the MSA and related documents could be terminated was by nonrenewal at the end of a renewal term.
>
> On the other hand, HUMC asserts that, pursuant to Section 9(c) of the MSA, either party could terminate at any time either during the [I]nitial term or the renewal term.

Counsel for both plaintiff and HUMC agreed there were no material factual disputes and it was appropriate for the court, on summary judgment, to interpret Paragraph 9 of the MSA to determine whether plaintiff was entitled to judgment as to the alleged breach of the SOWs (count four) and alleged breach of the implied covenant of good faith and fair dealing (count six).

The court found the MSA contained two paragraphs that governed different rights: automatic renewal after the Initial Term; and termination after the Initial Term. First, Paragraph 9(a), captioned "Term," provides that after the Initial Term of thirty-nine months, the MSA will renew annually unless HUMC provides notice of termination of the MSA ninety-days prior to the end of the Initial Term or any renewal term. Second, Paragraph 9(c) provides that after the

15

first three months of payment under the Initial Term, either party may terminate the MSA without cause upon ninety days' written notice. The court concluded that Paragraph 9(c) "clearly and unambiguously provides that, after the first three months of payment under the [I]nitial [T]erm, either party may terminate the MSA and related agreements during the [I]nitial [T]erm and any renewal term. Such termination could occur 'without cause by giving the other party [ninety] days' advanced written note.'"

Plaintiff also argued that by signing the extension agreement, plaintiff and HUMC understood that there would be an extension of plaintiff's provision of IT services to HUMC through January 4, 2021. Plaintiff further claimed it had presented evidence HUMC "expected that NTT Data would replace [plaintiff] by no later than May 2020" because HUMC had built into its master services agreement with NTT Data a penalty if NTT Data was unable to takeover NIT's duties by that date. Plaintiff therefore maintained that, at a minimum, questions of material fact existed as to whether HUMC and HMH had acted in bad faith by offering plaintiff the extension agreement "despite knowing it never intended to complete the term of that agreement." By contrast, HUMC asserted that "NTT Data and HMH began negotiations on the NTT Data MSA in July 2019, months

before either HUMC or [plaintiff] broached the discussion of any extension of the MSA."

On this issue, the court concluded that "since the [e]xtension [a]greement describes the SOWs as having been entered into 'under the MSA,' . . . the SOWs as modified by the extension agreement could be terminated on [ninety] days' notice by either party." In reviewing these provisions, the court concluded that "renewal is not the same as termination" and "neither [Paragraph] 9(a) nor [Paragraph] 9(c) refer to each other and, therefore, do not modify or govern the rights set forth in each separate provision."

The court found that "the right to renew the MSA and the right to terminate are separate rights pursuant to the MSA" and noted that "both counsel agreed that the terms of the various agreements were unambiguous, and the [c]ourt should interpret the agreement as written." The court further concluded that termination should be governed by Section 9(c) of the MSA and all of the SOWs could likewise be terminated by either party on ninety days' written notice, and that "since the [e]xtension [a]greement describes the SOWs as having been entered into 'under the MSA' . . . the SOWs as modified by the [e]xtension [a]greement could be terminated on ninety-days' notice by either party."

17

The court denied plaintiff's motion for summary judgment on the following claims in its complaint: breach of contract as to the non-solicitation provision in the MSA (count one); breach of contract as to the MSA and the SOWs, (count four) and breach of contract as to the unpaid invoices (count five). The court also denied plaintiff's motion as to HUMC's counterclaim for breach of contract (count two) and breach of the implied covenant of good faith and fair dealing with respect to the missing Surface Pros (count three). The court granted plaintiff's motion for summary judgment as to HUMC's counterclaim for conversion with respect to the missing Surface Pros (count one of HUMC's counterclaim).

The court also granted HUMC's motion for summary judgment as to counts three, four, five, six, seven and nine of plaintiff's third-amended complaint (misappropriation of trade secrets, breach of contract as to the SOWs and unpaid invoices, breach of the implied covenant of good faith and fair dealing, fraud and intentional misrepresentation, and enforcement of the restrictive covenants, respectively). The court denied HUMC's motion for summary judgment as to Littwin's counterclaims for alleged violations of the New Jersey Wage Theft Act and the New Jersey Wage Payment Law; and HUMC's counterclaims, count one (conversion of the missing Surface Pros) and

18

count three (breach of contract and breach of implied covenant of good faith and fair dealing with respect to the Anesthesia SOW).

The court also granted NTT's motion for summary judgment on plaintiff's count-eight claim alleging against it tortious interference with contract. The court further granted summary judgment in favor of all the individually named defendants, including Littwin and Covello, as to plaintiff's claim in count nine alleging violation of its restrictive covenant.

Two days later, on March 5, 2021, the court issued an order clarifying that its dismissal of count five of plaintiff's third-amended complaint (non-payment of invoices) pertained to invoices accounted for in the settlement agreement signed by plaintiff and HUMC in December 2019. Plaintiff moved for reconsideration of the court's summary-judgment ruling. The court denied the motion in an order dated April 1, 2021. The court specifically found both the settlement and extension agreements were entered into in good faith and plaintiff had provided no evidence to the contrary.

The effect of the court's rulings and orders on the various motions was that the following claims proceeded to trial: count one of plaintiff's complaint against HUMC for breach of the non-solicitation provision of the MSA related to the hiring of Littwin; counts four and five of the complaint against HUMC

for breach of the MSA and SOWs and plaintiff's claim for damages related to unpaid invoices; counts two and three of HUMC's counterclaim against plaintiff for breach of contract and the implied covenant of good faith and fair dealing regarding the missing Surface Pros; counts four and five of HUMC's counterclaim against plaintiff alleging breach of the MSA and SOWs related to the Help Desk and the alleged failure by plaintiff to provide services; and counts one and two of Littwin's counterclaim against plaintiff for alleged violations of the New Jersey Wage Theft Act and the New Jersey Wage Payment Law.

During the five-day bench trial, Hossain testified that under the Help Desk SOW, $443,305 was due and owing to plaintiff, including overage charges of $249,733 for the period from January through April 2020, as well as invoices for other SOWs totaling $193,571. The testimony was based on a report generated by Hossain summarizing the invoices, but the underlying invoices on which the summary report was based were not made available in discovery. On cross examination, Hossain conceded that invoices totaling $13,097.50 were shown in the report as "open" but had been paid. However, invoices totaling $115,486 were relied on by plaintiff and included in the calculation of its claimed damages in the report but had not been produced in discovery or at trial. HUMC did not receive Hossain's report but received an email on October 6,

A-1032-21

2020, from Hossain that listed invoices, including those from December 2014 and August 2019, which were not produced in discovery.

As to Littwin and his alleged violation of the non-compete policy in the employee manual, Blik testified that when Littwin had notified plaintiff on February 18, 2020, that he would begin employment with HMH on February 24, 2020, Blik terminated Littwin and directed Matrix's Human Resources Director to send Littwin a letter confirming their discussion and Littwin's termination. Littwin testified that he had reported for work with plaintiff on February 19, 20, and 21 and performed work on those days with access to the Remedy application and did not see the February 18, 2020 letter regarding his termination until after the litigation had commenced.

The court found that for purposes of Littwin's unpaid wage claim, he had credibly testified he had worked on February 19, 20, and 21, and was not paid for those three days. The court did not find credible his testimony concerning the timing and circumstances of his hiring by HMH for purposes of its determination of plaintiff's claim that Littwin had breached the non-compete policy in the manual.

Following the bench trial, in a comprehensive twenty-three-page opinion, the court found that HUMC should not be viewed as a separate entity from its

parent company HMH and that HUMC violated the non-solicitation clause in the MSA. The court, however, dismissed count one of the complaint, which alleged breach of contract as to the non-solicitation provision, concluding "[plaintiff] has not shown damages resulting from such violation" of the MSA as plaintiff "chose not to hire anyone to replace Mr. Littwin" and because Paragraph 4 of the MSA specifically excluded liability for "any lost profits or other indirect, special, incidental, exemplary or consequential damages."

As to plaintiff's claims concerning the alleged breach of the MSA, the SOWs, and the settlement agreement, the court found plaintiff had failed to present sufficient evidence establishing it had sustained any damages. The court concluded "[plaintiff] failed to produce, either during discovery or during the course of trial, the vast majority of the invoices as to which it seeks recovery." In denying plaintiff's claim in connection with the Anesthesia SOW, the court concluded "there is no evidence in the record pursuant to which the court may make any determination as to the value of any services which may have been provided by [plaintiff] to HUMC." Specifically, the court found the evidence did not allow it to determine the value of services plaintiff had rendered for configuring fifty Surface Pros under the Anesthesia SOW.

22

As to HUMC's breach-of-contract claims for plaintiff's failure to meet the "performance metrics" under the Help Desk SOW, among others, based on provisions in the MSA—which HUMC alleged entitled it to $449,413.40 in damages—the court dismissed these claims based on its determination there was insufficient evidence to support them. As to Littwin's wage claim, the court concluded Littwin was entitled to judgment in the amount of $3,467.88, representing the salary due for the three days—February 19, 20, and 21—he had worked but for which he did not receive payment. The court concluded that Blik's testimony as to the date of Littwin's termination was less credible "since he could not definitely state that Littwin was terminated as of February 18, 2020."

Addressing whether the disclaimer contained in plaintiff's employment manual effectively barred any claim that the manual constituted a binding and enforceable contract, and relying on the principles explained by the Supreme Court in Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 285-86 (1985) ("We hold that absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will."), the court rejected plaintiff's

A-1032-21

argument the non-compete clause in the employee manual constituted an enforceable contractual obligation restricting each individual defendant's ability to accept employment with HUMC. The court determined that "[t]he employment manual in question here indisputably contained" an effective disclaimer such that the manual, and its putative non-compete clause, did not "constitute a contract which binds the parties."

In reaching its conclusion, the court relied on Woolley for the proposition that an employer can avoid creating a contractual obligation in an employment agreement by providing a clear and prominent disclaimer. See id. at 285-86. It rejected plaintiff's argument that the acknowledgement signed by Littwin and the individual defendants resulted in a binding contractual obligation to abide by all the employee manual's requirements—including the non-compete provision—because the acknowledgement also incorporated the disclaimer stating, on the first page, the employee manual did not constitute a legally binding agreement.

The court entered an August 11, 2021 judgment followed by an amended judgment on November 18, 2021: dismissing, with prejudice, counts one, four, and five of plaintiff's third-amended complaint, alleging breach of contract as to the non-solicitation provision, breach of contract as to the MSA and SOWs

24

thereunder, and breach of contract as to the settlement agreement entered between plaintiff and HUMC. The court entered judgment in favor of HUMC and against plaintiff as to counts two and three of HUMC's counterclaim for breach of contract and the implied covenant of good faith and fair dealing regarding the missing Surface Pros, awarded damages of $134,537, and dismissed counts four and five of HUMC's counterclaim for breach of contract and breach of the covenant of good faith and fair dealing as to the MSA and SOWs. The court entered judgment in favor of Littwin and against plaintiff as to counts one and two of Littwin's counterclaim for violations of the New Jersey Wage Theft Act and Wage Payment Act and awarded him $3,467.88 in lost wages. The November 18, 2021 amended judgment also included an award of attorneys' fees to Littwin in the amount of $12,805.

This appeal followed with plaintiff presenting these arguments for our consideration:

> POINT II[7]
>
> THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S AFFIRMATIVE CLAIMS AGAINST RESPONDENT HUMC.

---

[7] Plaintiff's point I pertains to the standard of review and will not be separately addressed.

A-1032-21

A. THE TRIAL COURT ERRED IN ITS INTERPRETATION OF THE MASTER SERVICE AGREEMENT TERMINATION PROVISION.

B. THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S FOURTH AND FIFTH COUNTS FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND SEVENTH COUNT FOR FRAUD AND MISREPRESENTATION WITH RESPECT TO THE EXTENSION AND SETTLEMENT AGREEMENT.

1. THE TRIAL COURT FAILED TO ANALYZE APPELLANT'S SIXTH CAUSE OF ACTION UNDER THE PROPER LEGAL FRAMEWORK.

2. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DECLINING TO FIND HUMC BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN ENTERING INTO THE EXTENSION AGREEMENT AND/OR THE SETTLEMENT AGREEMENT.

C. THE TRIAL COURT IMPROPERLY DISMISSED APPELLANT'S CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FOR UNPAID INVOICES.

1. APPELLANT PROVED WITH UNREBUTTED EVIDENCE THAT HUMC FAILED TO PAY INVOICES FOR SERVICES RENDERED.

2. HUMC'S REFUSAL TO PAY HELP DESK OVERAGES OF $251,763.53 IN 2020

26

VIOLATED THE COVENANT OF GOOD FAITH AND FAIR DEALING AND THE TRIAL COURT'S REJECTION OF THIS CLAIM WAS PLAIN ERROR.

D. THE TRIAL COURT SHOULD BE REVERSED AND A MONEY JUDGMENT OF APPELLANT'S LOST PROFITS SHOULD BE ENTERED AGAINST HUMC FOR BREACH OF THE MSA NON-SOLICITATION PROVISION.

POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ENTERING JUDGMENT AGAINST APPELLANT IN FAVOR OF HUMC REGARDING THE LOST SURFACE PROS.

A. THE TRIAL COURT IMPROPERLY DENIED APPELLANT'S MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL OF HUMC'S SECOND AND THIRD COUNTERCLAIMS AS THERE WAS NO GENUINE ISSUE OF MATERIAL FACT AS THE THEFT OF THE SURFACE PROS CONSTITUTED AN INTERVENING CAUSE THAT PRECLUDE HUMC FROM ESTABLISHING PROXIMATE CAUSATION.

B. IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO AWARD JUDGMENT TO RESPONDENT HUMC REGARDING THE SURFACE PROS BASED ON THE EVIDENCE PRESENTED AT TRIAL.

1. THE TRIAL COURT'S DECISION PROVIDES NO LEGAL SUPPORT FOR ITS FINDING THAT APPELLANT ASSUMED

27

THE RISK OF LOSS FOR THE SURFACE PROS.

2. THE TRIAL COURT ERRED IN FAILING TO ADDRESS THAT THE INTENTIONAL TORT OF AN EMPLOYEE BREAKS THE CAUSAL CHAIN TO HOLD APPELLANT LIABLE.

3. THE TRIAL COURT FAILED TO CONSIDER HUMC'S FAILURE TO MITIGATE ITS DAMAGES.
4. THE TRIAL COURT IMPROPERLY ASSESSED DAMAGES AS THE COST OF REPLACEMENT RATHER THAN HUMC'S ACTUAL OUT OF POCKET LOSSES.

5. THE TRIAL COURT FAILED TO FIND THAT APPELLANT MET ITS OBLIGATION AND SUBSTANTIALLY PERFORMED UNDER THE ANESTHESIA SOW, ENTITLING IT TO A PRO RATA PORTION OF FEES UNDER THE ANESTHESIA SOW.

POINT IV

THE TRIAL COURT ERRED IN AWARDING JUDGMENT TO RESPONDENT LITTWIN.

A. THE TRIAL COURT'S RULINGS ON LITTWIN'S CREDIBILITY REQUIRED DISMISSAL OF HIS WAGE CLAIMS.

B. LITTWIN FAILED TO MEET HIS BURDEN OF PROOF TO DEMONSTRATE THAT HE ACTUALLY WORKED THE THREE DAYS ALLEGED.

C. THE TRIAL COURT ERRED IN AWARDING RESPONDENT LITTWIN $12,805.00 IN LEGAL FEES.

POINT V

IT WAS REVERSIBLE ERROR FOR THE COURT TO DISMISS APPELLANT'S CLAIMS FOR BREACH OF THE RESTRICTIVE COVENANTS AGREED TO BY LITTWIN & THE INDIVIDUAL DEFENDANTS.

A. THE TRIAL COURT IMPROPERLY HELD THAT APPELLANT'S RESTRICTIVE COVENANT WAS NOT ENFORCEABLE AS A MATTER OF LAW.

B. THE EVIDENCE PRESENTED ON SUMMARY JUDGMENT DEMONSTRATED THAT LITTWIN & THE INDIVIDUAL DEFENDANTS BREACHED THEIR RESTRICTIVE COVENANTS WITH APPELLANT.

POINT VI

APPELLANT'S CLAIMS AGAINST RESPONDENT NTT DATA SHOULD NOT HAVE BEEN DISMISSED.

A. APPELLANT WAS ENTITLED TO DISCOVERY CONCERNING THE NTT DATA MSA AND RETENTION OF THE INDIVIDUAL DEFENDANTS.

B. THE TRIAL COURT IMPROPERLY GRANTED RESPONDENT NTT DATA'S MOTION FOR SUMMARY JUDGMENT ON APPELLANT'S TORTIOUS INTERFERENCE CLAIM.

A-1032-21

## II.

We first address the court's order granting defendants' summary-judgment motion dismissing plaintiff's affirmative claims against HUMC for: the breach of the SOWs (count four); non-payment of invoices (count five); fraud and intentional misrepresentation with respect to the extension and settlement agreements (count seven); and enforcement of the restrictive covenant against the individual defendants (count nine).

We review summary-judgment orders de novo using the same standard that governs the trial court. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard requires the court to grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995). A reviewing court owes no special deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A-1032-21

As to the termination of the MSA, plaintiff asserts the court erred in its interpretation of the MSA's termination provision—Paragraph 9(c)—on the critical issue of whether HUMC had breached its contract with plaintiff by failing to provide adequate notice prior to its termination of the agreement. The determination of this issue impacted the court's denial of plaintiff's summary-judgment motion on counts four and five of the third-amended complaint (breach of contract claims as to the SOWs and unpaid invoices). The court also granted HUMC's cross-motion for summary judgment as to counts four and five of the third-amended complaint.

Plaintiff argues that Paragraph 9(c)'s "ninety-day termination provision only operated during the MSA's [I]nitial [T]erm, not its yearly renewal terms," and the court "failed to give meaning to each of the terms of the MSA" when it held that "after the first three months of payment under the [I]nitial [T]erm, either party may terminate the MSA and related agreements during the [I]nitial [T]erm and any renewal term." Specifically, plaintiff asserts that:

> Paragraph 9(a) indicates a difference between the "Initial Term" and "renewal term", where the "Initial Term" is defined as "The term . . . begin[ning] as of the Effective Date and . . . continu[ing] for a period of thirty-nine (39) months unless earlier terminated as provided herein" and "Renewal term" is defined as "After the Initial Term," each "annual [] . . . period of

31

one-year . . . unless ninety (90) days' notice is given by client prior to the end of the term or any renewal term."

Paragraph 9 of the MSA addresses the agreement's term and termination.

More particularly, Paragraph 9(a) provides that:

> The term of this Agreement shall begin as of the Effective Date and shall continue for a period of thirty-nine (39) months unless earlier terminated as provided herein ("Initial Term").  After the Initial Term this agreement shall renew annually for a period of one-year (renewal term) unless ninety (90) days' notice is given by client prior to the end of the term or any renewal term.  Six (6) mo[n]ths prior to the expiration of the Initial Term, and three (3) months prior to the expiration of any renewal term, the parties shall enter into discussions regarding the pricing for the renewal. In the event the parties do not agree prior to the renewal date, the pricing shall increase by 3% or the rate of inflation as measured by the Bureau of Labor Statistics for the month in which this agreement or any Statement of Work renews, whichever is less.  In no event shall the rate of inflation result in a reduction of the contract or Statement of Work pricing.

Plaintiff further asserts that because Paragraph 9(c) references only the "Initial Term," it was improper for the court to find that Paragraph 9(c) applies to any "renewal term" as "the parties expressly omitted such a reference from that provision."  Specifically, Paragraph 9(c), provides:

> After the first three (3) months of payments under the Initial Term, either party may terminate this Agreement and any [statements of work] without cause by giving the other Party [ninety] days advance written notice.  In

32

the event of termination, [HUMC] shall compensate [plaintiff] for work authorized and completed through the effective date of termination.

[Emphasis added.]

Additionally, plaintiff contends that if the right to terminate the MSA under Paragraph 9(c) continued throughout the "Initial Term" and all "Renewal" terms of the MSA, then the provisions of Paragraph 9(a)—allowing a party to prevent renewal by giving notice of non-renewal ninety days before the renewal date—would be superfluous and unnecessary because each party would be free to terminate at any time.

Plaintiff further argues the motion court failed to acknowledge that the one-year term of the extension agreement reflects the parties' intention that the ninety-day notice for termination applies only to the "Initial Term" and that the court's interpretation of the MSA "deprived [plaintiff] of the benefit of its bargain in entering into the [e]xtension [a]greement." Plaintiff contends that at a minimum, given the differing interpretations of Paragraph 9(c) and evidence of the parties' intent to have plaintiff serve HUMC through January 2021, the court should have denied the motions for summary judgment on the causes of action whose resolution is dependent on the disposition of this issue.

33

HUMC maintains that the court "properly granted summary judgment to [it] on [plaintiff's] breach of contract claim related to the MSA's termination provision,"[8] because "[P]aragraph 9(c) of the MSA clearly and unambiguously provides that, after the first three months of payment under the Initial Term, either party may terminate the MSA and related agreements during the [I]nitial [T]erm and any renewal term."

HUMC also maintains that the court correctly determined that Paragraph 9(a) expressly addressed renewal of the MSA and provided that HUMC could choose not to renew the MSA at the end of the Initial Term, which had long expired by the time it terminated the contract. HUMC argues the court correctly stated "renewal is not the same as termination" and "[t]he timing of notice of non-renewal was expressly tied to each Term, be it initial or renewal." It also argues that "[t]ermination . . . was not tied to any term and could be elected after the first three months of payments."

In addressing the termination provision in the MSA, the court denied plaintiff's motion for summary judgment as to counts four and five of the third-amended complaint (breach of contract as to the SOWs and unpaid invoices,

---

[8] We discern that HUMC in making this argument is referring to the claims in counts four and five, which pertain to the SOWs (count four) and unpaid invoices (count five), in the third-amended complaint.

respectively). In considering the termination issue, the court relied on the express language in Paragraph 9(c) of the MSA and concluded that it clearly and unambiguously:

> provides that, after the first three months of payment under the [I]nitial [T]erm, either party may terminate the MSA and related agreements during the [I]nitial [T]erm and any renewal term. Such termination could occur "without cause by giving the other party [ninety] days" advanced [notice].

We review a court's interpretation of a contract de novo. Serico v. Rothberg, 234 N.J. 168, 178 (2018). The interpretation of contract language is generally a question of law unless its meaning is unclear and turns on conflicting testimony. Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92 (App. Div. 2001). It is axiomatic, of course, that contract provisions are to "be read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)).

"[I]t is not the function of the court to make a better contract for the parties, or to supply terms that have not been agreed upon." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999) (citing Schenck v. HJI Assocs., 295 N.J. Super. 445, 450 (App. Div. 1996)). "If the terms of a contract are clear, we must enforce the contract as written and not make a better contract for either party." Ibid. "However, a contract must be interpreted considering the surrounding circumstances and the relationships of the parties at the time it was entered into, in order to understand their intent and to give effect to the nature of the agreement as expressed by them." Ibid.

We note that under either Paragraph 9(a) or (c), the issue is whether the parties to the agreements may terminate the MSA, SOWs, and extension agreement by providing the 90-days' notice permitted under Paragraph 9(c) only during the Initial Term or whether either party may also exercise the right to terminate the MSA, SOWs, and extension agreement consistent with HUMC's February 4, 2020 notice of termination under Paragraph 9(c) by providing 90-days' notice during any annual renewal period of the MSA following the Initial Term. As we have noted, the SOW's—the temporal terms of which were extended by the extension agreement—expressly provide that their terms are

otherwise subject to the MSA. Thus, Paragraph 9 of the MSA governs the termination of the MSA as well as all the SOWs.

With that in mind, we consider the express language contained in the relevant Paragraphs—9(a) and (c)—of the MSA. Paragraph 9(a), captioned "Term," provides that the agreement shall "renew annually for a period of one-year (renewal term) unless ninety (90) days' notice is given by the client prior to the end of the term or any renewal term." Paragraph 9(c), captioned "Termination," expressly applies after the expiration of the first three months of payments under the Initial Term of the contract and states that following those payments "either party may terminate this agreement and any SOW without cause by giving the other party [ninety] days advance written notice."

In reviewing the MSA terms, we discern no error in the motion court's conclusion that Paragraph 9(c) is the operative provision for purposes of analyzing plaintiff's breach-of-contract claims in counts four and five of the third-amended complaint. Contrary to plaintiff's assertion that there were differing interpretations of Paragraph 9(a) and (c) that warranted a denial of the motion for summary judgment and that the one-year extension agreement altered HUMC's right to terminate the contract because it reflected the parties' intent to

37

extend the agreement for the one-year term, we note that plaintiff's arguments are not supported by the plain language of the MSA.

Based on the plain language, Paragraph 9(a) is a "renewal provision" that governs the extension and renewal of the MSA, and Paragraph 9(c) is a "termination provision" that expressly addresses when a party may terminate the agreement and any SOWs "after the first three (3) months of payments under the Initial Term."  By contrast, Paragraph 9(a) expressly addresses the effective date, Initial Term, and renewal of the MSA, and although Paragraph 9(a) mentions "termination," it does so solely in the context of explaining the initial thirty-nine-month term of the MSA, stating "the term of this Agreement shall begin . . . and shall continue for a period of thirty-nine (39) months <u>unless earlier terminated</u>."  Only Paragraph 9(c) addresses termination of the MSA and SOWs within the relevant timeframe applicable here:  "after the first three (3) months of payments under the Initial Term."

In considering the plain language of the renewal and termination provisions, we are satisfied that the renewal provision has no application here because the issue presented is not whether the agreement was properly renewed at the end of its term or whether HUMC provided proper notice of non-renewal. Rather, the issue is whether HUMC provided proper notice of its intent to

A-1032-21

terminate the MSA in its letter dated February 4, 2020—after having signed the extension agreement on November 18, 2019.

We first address plaintiff's argument that the court erred in its interpretation of the MSA's termination provision and in granting summary judgment in favor of HUMC's interpretation of Paragraph 9 on counts four and five of the third-amended complaint because the parties presented two opposite interpretations of Paragraph 9: plaintiff's argument that the ninety-day provision operated only during the MSA's Initial Term, not its yearly renewal terms, and HUMC's argument that the ninety-days' notice period applied at any time during the term of the MSA.

We also discern no ambiguity in Paragraph 9(a) and 9(c). Only the latter applies to terminations of the contract, and it permits termination of the contract by the provision of ninety-days' notice "[a]fter the first three (3) months of payment under the Initial Term." HUMC provided notice of termination of the MSA in accordance with that plainly stated requirement. Where the intent of the parties to a contract is clear and the plain "language of the contract is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Quinn, 225 N.J. at 45.

Additionally, we are not persuaded by plaintiff's argument that because Paragraph 9(c) refers to the "Initial Term," the right to terminate the agreement did not apply to any "renewal term." In the first instance, we reject the argument because the reference to the Initial Term in Paragraph 9(c) relates to the commencement, and not end date, of the period during which the parties may terminate the agreement. That is, Paragraph 9(c) allows for the termination of the MSA at any time "[a]fter the first three (3) months of payments under the Initial Term." We also reject plaintiff's argument because the MSA otherwise provides for automatic renewals of the agreement beyond the Initial Term, Paragraph 9(c) does not limit the exercise of the right to terminate to the agreement to the Initial Term, and we are not at liberty to add or subtract from the terms contained in the parties' agreement. E. Brunswick Sewerage Auth. v. E. Mill Ass'n, Inc., 365 N.J. Super. 120, 125 (App. Div. 2004).

Again, Paragraph 9(c) clearly provides that either party may terminate the MSA and, for the reasons we have explained, the SOWs as well, by giving the other ninety-days' notice, and there is no language in the extension agreement modifying this plainly stated termination right. Indeed, the extension agreement simply extended the temporal terms of the SOWs, but the express terms of the SOWs otherwise remained the same and they provided that termination of the

40

agreements was governed by the MSA. Plaintiff's claim to the contrary finds no support in language found in the MSA or the extension agreement and, if adopted, would render the Paragraph 9(c) termination provision meaningless. Porreca v. City of Millville, 419 N.J. Super. 212, 233 (App. Div. 2011) ("A contract 'should not be interpreted to render one of its terms meaningless.'") (quoting Cumberland Cnty. Improvement v. GSP Recycling Co., 358 N.J. Super 484, 497 (App. Div. 2011)).

We also conclude there is no support for plaintiff's argument that the court's interpretation of the MSA deprived it of the benefit of its bargain in entering into the extension agreement. As HUMC asserts, courts cannot make a better contract for parties than the parties made for themselves, and here the extension agreement is subject to the terms of the MSA, which includes Paragraph 9(c). See Graziano, 326 N.J. Super. at 342 ("It is not the function of the court . . . to supply terms that have not been agreed upon.").

We are further persuaded that Paragraph 9(c) is the operative provision intended to govern terminations after the Initial Term because of the express language contained in the final sentence of the Paragraph, which provides that "[i]n the event of termination, [HUMC] shall compensate NIT for work authorized and completed through the effective date of termination." The

41

language expressly requiring that payment be made for work performed prior to termination of the agreement is not found anywhere else in the parties' agreement, including Paragraph 9(a), and is indicative of the parties' intent that Paragraph 9(c) governs termination of the agreement.

We therefore decline to adopt plaintiff's interpretation of Paragraph 9 and remain unpersuaded that the trial court erred in granting summary judgment in favor of HUMC as to plaintiff's claims that HUMC breached the MSA by failing to provide it with timely notice prior to terminating the contract with HUMC. Thus, the court's grant of summary judgment in favor of HUMC was proper as to plaintiff's counts four (breach of the SOWs) and five (breach of contract as to the unpaid invoices). Likewise, the court's denial of plaintiff's summary judgment as to counts four (breach of the SOWs) and five (breach of contract as to the unpaid invoices) was proper.

We next consider plaintiff's argument that the court erred in dismissing counts six of the third-amended complaint—for breach of the implied covenant of good faith and fair dealing—as to the MSA, SOWs, extension and settlement agreements, and that the court provided no analysis supporting its determination.

Plaintiff argues the court erred because it made no finding about the elements of the covenant of good faith and fair dealing, see Sons of Thunder v.

42

Borden, Inc., 148 N.J. 396, 420 (1997) ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement . . . . Good faith is defined as 'honesty in fact in the conduct or transaction concerned.'") (first citing N.J.S.A. 12A:1–203, then quoting N.J.S.A. 12A:1–201(19)), and did not give plaintiff all favorable inferences. Instead, according to plaintiff, the court simply dismissed count seven, finding plaintiff had not presented evidence supporting a cause of action for fraudulent misrepresentation.

According to plaintiff, HUMC breached the covenant of good faith and fair dealing by executing the extension agreement with plaintiff shortly after "secretly" retaining NTT to replace them just two months after agreeing to the extension and settling plaintiff's claims at a significant discount. Further, plaintiff alleges HUMC executed and performed the extension and settlement agreements solely to ensure that it could continue to utilize plaintiff's information technology services for "only so long as necessary until defendant NTT Data was ready to assume responsibility for HUMC's information technology needs." Plaintiff maintains that these acts of HUMC constituted breaches of the covenant of good faith and fair dealing. Plaintiff further argues that a breach of the implied covenant of good faith and fair dealing is incorporated into every contract and is violated where the breaching party

43

deprives the other party from "receiving its reasonably expected fruits under the contract."

HUMC asserts that the court's "findings of facts and conclusions of law fully support dismissal of count six and demonstrate that HUMC did not deprive [plaintiff] from receiving its 'reasonably expected fruits under the contract'" and that plaintiff's expectations it would continue to provide services to HUMC for one full year is not reasonable when the extension agreement "could be terminated with [ninety-days'] notice."

The covenant of good faith and fair dealing is implied in every contract in New Jersey. Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). This means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Sons of Thunder, Inc., 148 N.J. at 421.

> Good faith is a concept that defies precise definition. The Uniform Commercial Code, as codified in New Jersey, defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Good faith conduct is conduct that does not "violate community standards of decency, fairness or reasonableness." "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." The [covenant] calls for parties to a contract to refrain from doing "anything which

44

> will have the effect of destroying or injuring the right of the other party to receive" the benefits of the contract.
>
> [Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224-25 (2005) (citations omitted).]

The party claiming a breach of the covenant must show the other party "engaged in some conduct that denied the benefit of the bargain originally intended by the parties." Id. at 225. "[A]n allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive." Id. at 231 (quoting Wade v. Kessler Inst., 172 N.J. 327, 341 (2002)).

Based on our de novo review of the record, we discern no basis to conclude the court erred in granting HUMC's summary judgment dismissing count six (the implied covenant of good faith and fair dealing claim) and denying plaintiff's reconsideration motion. We reach this determination because the implied covenant of good faith and fair dealing cannot override an express term in a contract. Wilson, 168 N.J. at 244.

Here, plaintiff's count six claim for breach of the implied covenant of good faith—based on HUMC's "failure to disclose its agreement with NTT Data"— ignores that the extension agreement is subject to the MSA, as we have previously determined, which provides for termination on ninety-days' notice.

The extension agreement is not a stand-alone document; it extends the SOWs specifically referenced therein until January 4, 2021. Given the plain language in the SOWs, Paragraph 9 of the MSA governs the termination of the SOWs. And no party argues to the contrary. HUMC's notice of termination expressly sought to terminate the MSA and SOWs, including the Help Desk, Anesthesia and Remedy SOWs in effect at the time.

Because the extended terms of the SOWs continued to be governed by the MSA's termination provision in Paragraph 9, plaintiff cannot establish a breach of the covenant of good faith and fair dealing by virtue of HUMC's exercise of its right to terminate the extension agreement when it had a contractual right to do so under the express language in the MSA. Ibid.

An allegation of bad faith or unfair dealing may not be advanced in the abstract and absent improper motive. Id. at 251. Plaintiff alleges HUMC's sole motive for signing the extension agreement and approximately one month later entering into a settlement agreement with plaintiff was the potential of receiving a significant discount on moneys owed to plaintiff for prior services. Nevertheless, the court in examining this issue found that the extension agreement and the settlement agreement were separate and distinct, and even considering their "temporal proximity"—the agreements were signed

approximately one month apart—plaintiff did not provide evidence of bad faith on the part of HUMC when it gave proper notice of termination of the extension agreement one month after signing the settlement agreement. Plaintiff points to no evidence of bad motive or intent, and, like the motion court, we are persuaded that HUMC's decision to terminate the extension agreement and ultimately the MSA prior to January 2021 does not constitute bad faith or breach of good faith and fair dealing under those agreements. And, in the absence of a showing of "bad motive or intention, discretionary decisions that happen to result in economic disadvantage to a party are of no legal significance." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 261 (App. Div. 2002) (quoting Wilson, 168 N.J. at 261).

We therefore agree with HUMC's argument that "there is no evidence that [it] acted in bad faith or performed its contractual obligation with a lack of good faith" by terminating the extension agreement prior to January 2021. Contrary to plaintiff's assertion, the court specifically found both the settlement and extension agreements were performed in accordance with their terms and enforced in good faith and that plaintiff provided no evidence to the contrary.

Plaintiff's argument that the court erred in dismissing count seven—alleging fraudulent misrepresentation—is equally unavailing. As with plaintiff's

47

claim that HUMC violated the covenant of good faith and fair dealing, plaintiff asserts that it entered into the settlement agreement on "false pretenses from the onset of negotiations . . . ." Plaintiff, however, fails to articulate any specific statements or misrepresentations it alleges HUMC made and instead seemingly relies on HUMC's settlement of their claims and subsequent termination of the extension agreement as establishing the alleged fraudulent misrepresentation. Again, plaintiff argued before the motion court that HUMC negotiated the extension agreement after it had executed its agreement with NTT and that HUMC negotiated and executed the extension and settlement agreements when it had no intention of fulfilling the terms of the extension agreement for the one-year term to save itself approximately $900,000.

The extension agreement lists a number of "whereas" paragraphs that recount plaintiff's and HUMC's prior agreements, including the extension of "the Field Services SOW, Help Desk SOW, CVP SOW, Faculty Practice SOW, Remedy SOW, Telecomm SOW and the Backlog SOW . . . to maintain the status quo through January 4, 2021." The settlement agreement also contains a number of similar provisions summarizing "various statements of work under the MSA."

Plaintiff claimed that at the time the extension agreement was signed, HUMC owed it nearly $2 million in overage fees that had accrued prior to

48

January 1, 2019, but on December 18, 2019, the parties signed the settlement agreement providing that HUMC would pay plaintiff only $1,000,070 for those fees. Plaintiff maintains HUMC's entry into settlement discussions with NIT related to the extension agreement while simultaneously conducting negotiations with NTT for a replacement MSA "solely to extract significant concessions by NIT on owed accounts receivables," constituted sufficient evidence supporting its cause of action for fraud and misrepresentation.

On this issue, the court found plaintiff had "failed to demonstrate the elements of fraudulent misrepresentation as to HUMC's execution" of the extension agreement and settlement agreement. Rather, the court found the agreements were separate and the "terms of the settlement agreement stated that the parties did not rely on any the representations, except as specifically set forth therein." The court dismissed count seven of the third-amended complaint on that basis. On reconsideration, the court clarified that it had considered all the evidence, including "the temporal relationship between the execution" of the settlement and extension agreements and HUMC's failure to disclose its negotiations with NTT, in finding no fraudulent representations in the execution of the settlement or extension agreements.

A-1032-21

Fraudulent misrepresentation occurs when an individual purports to represent a fact when it is in fact false. Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624 (1981). Moreover, legal fraud or fraudulent misrepresentation must be established by clear and convincing evidence. See Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395-96 (App. Div. 1989). "To establish common-law fraud, a plaintiff must prove: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)).

Here, plaintiff is seeking to establish fraudulent misrepresentation by implication based on HUMC's conduct in seeking to retain NTT's services after having agreed to a contract extension with them. But fraudulent misrepresentation cannot be implied based on HUMC's conduct as alleged here; rather, plaintiff was required to present evidence establishing the elements required to sustain its fraud claim, including by showing clear and convincing evidence of a material misrepresentation of a presently existing fact, known or

believed by HUMC, with the intention that there will be reasonable reliance on the misrepresentation, Jewish Ctr. of Sussex Cnty., 86 N.J. at 624.

Plaintiff does not argue that HUMC's failure to disclose its negotiations with NTT constitutes fraudulent misrepresentation. In fact, plaintiff offers little support for its claim the court erred in dismissing count seven for fraud and misrepresentation. We note, however, plaintiff fails to point to any evidence presented to the motion court establishing each of the essential elements of its fraud claim.

The record shows that plaintiff and HUMC entered into the settlement agreement, adjusting part of plaintiff's financial claims against HUMC at a discount. And there is no dispute that HUMC had been negotiating with NTT for IT services when it signed the extension agreement with plaintiff in November 2019, and the settlement agreement in December 2019. Nevertheless, the record lacks any evidence HUMC misrepresented any facts pertinent to its entry into the extension or relating to its negotiations with NTT. Plaintiff also makes no showing that any requirement to notify plaintiff of its negotiations with another entity exists in the MSA or in the law. Moreover, we observe that it is hardly imprudent for a hospital to ensure continuing IT services while

51

seeking a new IT vendor and then delivering notice to terminate a prior agreement—the MSA—in the manner expressly set forth in that agreement.

And, even if plaintiff had submitted such proof at trial, the settlement agreement itself stated the parties did not rely on any representations except those specifically included in the agreement, and plaintiff does not assert that there are misrepresentations in the settlement agreement. See JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 160 (App. Div. 2022) (quoting In re County of Atl., 230 N.J. 237, 254 (2017) ("It is well-settled that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'") (internal quotations omitted); M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002) (stating contract terms are generally "given their plain and ordinary meaning").

Plaintiff provides no evidence of any fraudulent misrepresentations and bases its argument entirely on HUMC's actions in terminating the MSA or settling plaintiff's claims at an admittedly reduced rate, only to subsequently terminate the MSA. Accordingly, plaintiff did not establish, by clear and convincing evidence, that HUMC made fraudulent misrepresentations on which plaintiff relied, and, thus, cannot satisfy the elements to sustain its claim for

fraudulent misrepresentation. We therefore affirm the court's dismissal of plaintiff's fraudulent-misrepresentation claim.

## III.

Turning to the issues at trial, we next address plaintiff's argument the court erred in dismissing its claim against HUMC for unpaid invoices and committed reversible error by entering judgment in favor of HUMC regarding the lost Surface Pro computers.

Our "review of a judgment following a bench trial is limited." Accounteks.net, Inc. v. CKR Law, LLP, 475 N.J. Super. 493, 503 (App. Div. 2023). "The trial court's factual findings are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record." Ibid. Moreover, "[d]eference is particularly appropriate when the court's findings depend on credibility evaluations made after a full opportunity to observe witnesses testify, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and the court's 'feel of the case.'" Accounteks.net, Inc., 475 N.J. Super. at 503 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). For that reason, "[i]n reviewing the judge's findings, '[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence.'" 160 W. Broadway Assocs., LP v. 1 Memorial Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (second

alteration in original) (quoting <u>Mountain Hill, LLC v. Twp. of Middletown</u>, 399

N.J. Super. 486, 498 (App. Div. 2008)).

Plaintiff's argument with respect to the unpaid invoices is two-fold:  1) the court "improperly failed to afford any weight" to Hossain's report summarizing a number of outstanding invoices and "placed an overreliance on the fact that five of six-hundred-and-seventeen invoices contained in plaintiff's [r]eport were challenged by HUMC at trial"; and 2) the court "erroneously rejected plaintiff's request to seek overage charges of $251,763.53 for January, February, March and April 2020" based on its determination that no overage charges had become due under the terms of the MSA and Help Desk SOW because the MSA provided that "overage charges between plaintiff and HUMC were calculated annually at the end of the calendar year" and the contractual annual threshold of 120,000 calls was never reached in 2020.

On the first issue, at trial plaintiff produced a report from Houssain summarizing a number of outstanding invoices, but plaintiff never produced or presented at trial the invoices referenced in the report.  HUMC's counsel objected to the admission of the report, but it was admitted into evidence over the objection in accordance with N.J.R.E. 1006.  In its decision, the court concluded that plaintiff had failed to produce the "vast majority of the invoices

as to which it seeks recovery."  Plaintiff asserted that the invoices could not be located, but the judge observed that the invoices dated back to only 2019 and 2020, and stated:

> I have a difficult time getting my head around the fact that somebody could have a claim for $569,000 worth of outstanding invoices and yet don't have the invoices available.  And these are invoices that go back to 2019 and 2020.  I'm not being asked – people aren't being asked to produce invoices that go back substantial periods of time.
>
> . . . .
>
> [plaintiff] failed to produce, either during discovery or during the course of the trial, the vast majority of the invoices as to which it seeks recovery.  Further, the trial testimony calls into significant question the bona fides of all such claims by [plaintiff], which has failed to prove to this court that it is entitled to collect any of the money for services which it claims.

Here, the original invoices were not made available at trial and absent such critical evidence, the court determined plaintiff could not sustain its burden of proof.  Nothing about the court's decision on this issue warrants reversal.  See Accounteks.net, Inc., 475 N.J. Super. at 503 ("The trial court's factual findings are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record.").  And, the court's determination that plaintiff lacked evidence and failed to sustain its burden of proof is unassailable and

entitled to deference. Balducci v. Cige, 240 N.J. 574, 595 (2020) ("We may not overturn the trial court's factfindings unless we conclude that those findings are 'manifestly unsupported' by the 'reasonably credible evidence' in the record.") (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

As to plaintiff's claims related to the Help Desk SOW overage charges from January 2020 to April 2020, plaintiff contends that at trial it demonstrated that "between January 2020 and April 2020, [it] went well beyond the normal help desk functions to assist HUMC with their ransomware attack and the fallout of COVID-19, despite knowing that their agreement would be terminated as of May 2020." The court, however, found plaintiff had not yet handled 125,000 calls for the year, so no actual overages had occurred under the parties' agreement.

Hossain's report included a monthly overage charge calculation based on whether the call-volume exceeded the monthly average. However, as noted by the court, the MSA does not require a monthly calculation of overage charges until the call volume exceeded 125,000 in a given year. The court found that "[t]he evidence at trial reveals that overage charges between [plaintiff] and HUMC were calculated annually at the end of the calendar year."

We agree that based on the undisputed facts, at the time plaintiff began invoicing HUMC for monthly overages, HUMC had not yet reached the annual threshold of 125,000 calls as set forth in the MSA. And, pursuant to the express terms of the Help Desk SOW, the overage charges were meant to be calculated when the yearly call-volume threshold was reached and there was no basis in the MSA or Help Desk SOW to support plaintiff's bald assertion that "HUMC was obligated to compensate [plaintiff] for its pro rata work when it prematurely terminated [] the [e]xtension [a]greement." The contract simply does not contemplate a pro rata payment method, and we may not write into an agreement a provision the parties opted not to include. Graziano, 326 N.J. Super. at 342 ("It is not the function of the court . . . to supply terms that have not been agreed upon."); see also Schenck, 295 N.J. Super at 450; see also E. Brunswick Sewerage Auth., 365 N.J. Super. at 125.

We also reject plaintiff's argument that the motion court committed reversible error by entering judgment in favor of HUMC regarding the lost Surface Pros.[9] In its counterclaims, HUMC alleged plaintiff had breached the Anesthesia SOW by failing to provide the Surface Pros and complete the work

_____

[9] The court granted plaintiff summary judgment dismissing HUMC's conversion counterclaim but denied its motion to dismiss HUMC's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

agreed upon and plaintiff had breached the implied covenant of good faith and fair dealing with respect to the Surface Pros and the Anesthesia SOW. HUMC alleged that plaintiff was responsible for all IT inventory, including the Surface Pros pursuant to the terms of the Anesthesia SOW and breached the SOW by failing to "deploy even a single Surface Pro to the end users" resulting in $134,000 in "missing hardware and accessories."

Plaintiff argues the court erred by finding it last had possession of the Surface Pros and, therefore, assumed the risk of care and custody of them. According to plaintiff, the Anesthesia SOW did not expressly obligate it to assume the risk of loss of the Surface Pros and the court added an implied term to the Anesthesia SOW.

The evidence at trial demonstrated that the Surface Pros went missing while in the care and custody of plaintiff after it had confirmed delivery and receipt of the entire shipment, which was stored in a protected area of HUMC under the control of plaintiff until sixty-one of the computers went missing. Although the Anesthesia SOW did not expressly provide that plaintiff assumed the risk for the Surface Pros, it required plaintiff to accept, unbox, inventory, configure, and distribute them and it was implicit in the Anesthesia SOW that

when plaintiff began working on the Surface Pros, it became responsible for the care and custody of them.

The court found that "[w]hile the Anesthesia SOW is silent as to the required activities of [plaintiff] to protect [the Surface Pros], it is implied that [plaintiff] was responsible for the care and custody of the Surface Pros."  The court went on to state that:

> [Plaintiff] cannot explain what occurred and cannot provide any explanation as to when any of its representatives last saw the missing Surface Pros.  In allocating responsibility, this court must conclude that [plaintiff] last had possession of the [sixty-one] [S]urface [P]ros and is responsible for their loss.

The court then awarded $134,537 to HUMC, representing the value of the missing Surface Pros.  In doing so, the court also found HUMC was not responsible for the $14,900 in costs plaintiff sought for configuring the Surface Pros because that work was never completed.

We accept and are bound by the court's findings of fact, which are supported by substantial credible evidence in the record.  Accounteks.net, Inc., 475 N.J. Super. at 503.  The court found that when plaintiff began to work on the Surface Pros, it became responsible for the care and custody of them and it was plaintiff who was last in possession of the computers.  From this record, it is undisputed that the Anesthesia SOW required plaintiff to configure one-

59

hundred and fifty Surface Pros, deploy them and provide training to anesthesiologists on how to use them. This never happened because the majority of the Surface Pros went missing. Plaintiff contends that some Surface Pros were configured but acknowledged that none were ever deployed, and no training was provided. It suggests that the invoice for the Anesthesia SOW should have been applied pro rata based on the alleged work performed on the Surface Pros that were not lost or stolen. However, neither the MSA nor Anesthesia SOW provided any basis by which the court could calculate a value for partial work. And, instead, the court determined the value of the missing equipment in rendering its decision.

We therefore discern no error in the court's allocation of responsibility or determination of the value of the missing Surface Pros computer equipment that warrants reversal.

IV.

Plaintiff also argues the court erred in ordering that it pay damages to Littwin for the wages it had failed to pay him for his work from February 19 to 21, 2021, plus liquidated damages of 200 percent of the wages, plus costs and attorneys' fees, as required under N.J.S.A. 34:11-4.10(c).

Littwin testified that he notified plaintiff's president on February 18, 2020, that he would begin employment with HMH on February 24, 2020, and his last day of work for plaintiff would be February 21, 2020. According to Littwin, on February 18, 2020, Blik informed him that he was in breach of the MSA's non-compete policy, but at his deposition Blik could not recall the conversation clearly and did not remember whether he had terminated Littwin. That same day, plaintiff disabled Littwin's accounts so he could no longer access its system, however, Littwin still had access to his HUMC email and credentials. And, it is undisputed that Littwin reported for work on February 19, 20, and 21 and logged his time each day.

The court found Littwin's testimony not credible with respect to the conditions under which he was hired by HUMC. But it found his testimony regarding his lost wages to be credible and, therefore, awarded him damages of $3,467.88, representing unpaid wages of $1,155 for the three days plus 200 percent of the unpaid wages ($2,311.92). The court also awarded fees of $12,805 even though $18,322 had been requested.

Central to plaintiff's argument is that the court found Littwin lacked credibility when he testified about the circumstances under which he was hired by HUMC. Plaintiff suggests that the court erred by failing to dismiss all of

Littwin's testimony after finding he lacked credibility when he testified about the timing of his employment with HUMC—which was in violation of the non-compete clause.

The court, however, specifically found Littwin's testimony credible that he was entitled to be paid for the days he worked after notifying plaintiff of his impending departure and plaintiff having sent him a termination letter. The court considered that he still had his credentials, access to emails, and concluded that he was capable of completing his work week as he had claimed. The court's decision, which was based on Littwin's testimony and the court's finding that he was credible, is entitled to deference. "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). The court's factual findings supporting its damages award are supported by substantial credible evidence the court deemed credible. We therefore find no basis to reverse the court's judgment in Littwin's favor.

V.

On a related matter, plaintiff next contends the court was incorrect in failing to award damages after concluding that HUMC had breached the non-

solicitation clause by hiring Littwin. Plaintiff sought $8,500 in lost profits related to HUMC's breach of the non-solicitation clause that resulted in plaintiff not being able to perform its obligations under the Remedy SOW. Plaintiff claimed direct damages pursuant to the MSA. The court declined to award damages based on its finding that the correct measure of damages would have been lost profits, which are expressly prohibited under the MSA.

We agree lost profits are expressly prohibited under the MSA, which states "[i]n no event shall either party . . . be liable for any lost profits or any other indirect, special, incidental, exemplary or consequential damages . . . ," and plaintiff's attempt to characterize its losses as direct damages is unavailing. There is no dispute plaintiff sought damages related to its alleged lost profits: income it may have earned had HUMC not hired Littwin. Thus, because plaintiff did not establish a basis for any damages other than lost profits, the court correctly found plaintiff was not entitled to the lost-profits damages it sought for HUMC's breach of the non-solicitation clause.

VI.

We also address whether the non-compete policy in the employee manual constitutes a contract. Plaintiff appealed from the court's determination there was no binding contract, asserting the court erred in dismissing count nine,

A-1032-21

which sought enforcement of the restrictive covenant in the non-solicitation provision of the employee manual against the individual defendants. We remain unpersuaded.

In granting summary judgment in favor of the individual defendants as to this claim, the court determined that the restrictive covenant in its employee manual limiting its employees' ability to accept employment with HUMC was not binding because the manual did not constitute a binding contract under the principles explained by the Court in Woolley. See Woolley, 99 N.J. at 309. The trial court stated:

> In Woolley, the New Jersey Supreme Court was presented with an employment manual and asked to decide whether the terms therein created a contractual obligation. The [C]ourt in Woolley held that an employer can confirmatively avoid creating a contractual obligation in an employment agreement by providing a clear and prominent disclaimer. That the handbook is not a contract, reserving the right for the employer to revise the handbook with or without notice.
>
> The employment manual in question here indisputably contained such a disclaimer, and, thus, does not constitute a contract which binds the parties.

Plaintiff also argues the acknowledgement form employees were required to sign, which referenced the employment manual containing the non-compete

clause, constituted a contract in-and-of itself. The court also rejected this argument, stating:

> [Plaintiff] asks this [c]ourt to conclude that a physically separate acknowledgement form whereby employees acknowledged having received and read the employment manual creates a restrictive covenant and precludes the individuals from competing pursuant to that document. The disclaimer in the employment manual is positioned prominently at the beginning of the manual. The disclaimer is not provided for in every subsection, and the disclaimer only applies to the employment manual taken as a whole. Nor does the employment manual contain any language exempting the acknowledgement from the disclaimer.
>
> In fact, this [c]ourt has a difficult time believing that the actual terms of the employment manual, including those with respect to . . . [plaintiff's] non[-]compete and confidentiality policies, are not binding in themselves, but that somehow by an act of acknowledgement that one has read the manual, that this binds the employees to the terms of the manual. The [c]ourt rejects such argument.
>
> . . . .
>
> If the acknowledgement form were to be construed or is to be construed as a contract separate and apart from the employment manual, it is facially defective, as it fails to describe the terms of the agreement which the parties are binding themselves to.

We conclude that although defendant Littwin signed the acknowledgment form, the disclaimer in plaintiff's employment manual rendered both the manual

A-1032-21

and disclaimer non-binding given that the manual, referenced in the signed acknowledgement, contains a disclaimer that makes clear the manual is not a contract. To be effective, a disclaimer must be sufficient to advise a reasonable reader that the document does not create a legally binding obligation. Woolley, 99 N.J. at 297-99. Although specific language is not required, the disclaimer must clearly advise the employee that the employer has the power to terminate employment "with or without cause." Id. at 309. The disclaimer must also be "in a very prominent position." Ibid.[10]

We conclude, as the trial court did, that plaintiff's disclaimer satisfied the requisite legal standard for conspicuousness. The manual contains a very prominent Woolley disclaimer on the first page—between the cover page and the table of contents—stating:

---

[10] The requirement of prominence may be satisfied in a variety of ways so long as it is "separated from or set off in a way to attract attention." Nicosia v. Wakefern Food Corp., 136 N.J. 401, 415 (1994). Ways to give a statement prominence include bold lettering, italics, capital letters, underlining, color, bordering, or highlighting or any other presentation that would "make it likely that it would come to the attention of an employee reviewing it." Id. at 415-16. "[T]he requirement of prominence can be satisfied in a variety of settings, and [] no single distinctive feature is essential per se to make a disclaimer conspicuous." Id. at 416. Where the content and placement of the disclaimer is undisputed, the effectiveness of the disclaimer is a question of law to be decided by the court. Ibid. The question of conspicuousness is always a question of law. Ibid.

ABOUT THIS MANUAL / DISCLAIMER

. . . .

Neither this manual nor any other verbal or written communication by a management representative, is, nor should it be considered to be, an agreement, contract of employment, express or implied, or a promise of treatment in any particular manner in any given situation. [Plaintiff] adheres to the policy of employment at will, which permits the Company or the employee to terminate the employment relationship at any time, for any reason, with or without cause or notice.

[Emphasis in original.]

We further reject plaintiff's argument that the signing of the subsequent acknowledgement form incorporated the employee manual, and the non-compete provision within it, into a binding contract. The acknowledgment required employees to read and sign a form confirming receipt and acknowledgment of the Employee Manual. To conclude otherwise would allow plaintiff to make an end run around its own Woolley disclaimer and illogically permit it to claim the manual does not constitute a binding contract as it concerns plaintiff's obligations to its employees and, at the same time, claim it is a binding contract as it concerns provisions of the manual listing putative employee obligations to plaintiff. See Morgan v. Raymours Furniture Co., 443 N.J. Super. 338, 342-43 (App. Div. 2016) (explaining that it is "inequitable" for an employer

to "seek both the benefit of its disclaimer, while insisting that the handbook was contractual when it suits its purposes"). Also, the disclaimer covers any other communications with plaintiff and expressly states that such communications do not constitute binding contractual obligations. As such, the acknowledgement, which was communicated to the employees when they received the manual, fell within the disclaimer's express terms and, as stated in the disclaimer, also did not constitute, and did not establish, a binding contractual obligation.

In sum, our review of the trial court's opinion leads us to conclude the court evaluated each and every claim asserted by the parties and resolved them by making appropriate findings of fact, credibility determinations, and legal conclusions consistent with the MSA and the law. To the extent we have not addressed any arguments, we conclude they lack sufficient merit to warrant any further discussion in this written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1032-21